UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRI-TAYLOR, LLC,

Plaintiff,

v.

CITY OF TAYLOR,

Defendant.
_______________________________/

Case No. 2:24-cv-10407

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 53) AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 55)**

In this land-use dispute, Plaintiff GRI-Taylor, LLC ("GRI") contends that Defendant City of Taylor (the "City") conditioned GRI's use of an industrial property on extending and looping a public water main, dedicating an easement, and bearing the associated cost of that extension. The City disputes that it ever imposed such a condition and maintains that GRI simply failed to complete the ordinary site-plan-review process. Both Parties have moved for summary judgment. As explained below, there are disputes of fact that render summary judgment inappropriate on all claims except GRI's regulatory-taking claim. Accordingly, this Court will grant the City's motion with respect to this claim, and with otherwise deny the rest of its motion and GRI's motion.

## I. BACKGROUND

### A. The Property and the Proposed Use

The property in dispute is located at 6900 Pardee Road in Taylor, Michigan (the "Property"), and consists of two parcels totaling approximately 16.85 acres. ECF No. 55-2 at PageID.2799–811. The Property is zoned I-1 Industrial. *Id.* at PageID.2801, 2809. The site contains three existing buildings. ECF No. 55-5 at PageID.2989. Residential properties abut the Property to the west and along much of its northern boundary, while a railroad lies to the South. ECF Nos. 55-5 at PageID.2989–90; 55-2 at PageID.2802, 2810.

A commercial landscape-supply business is permitted by right in the I-1 district. *See* ECF No. 55-3 at PageID.2825–26. Shemin Nurseries operated a landscape-supply business at the Property until about 2010 and continued to maintain the site after vacating it. ECF No. 55-4 at PageID.2980. In 2019, Henkels & McCoy[1] leased the Property and sought permission to use it as a contractor's yard. ECF No. 55-5 at PageID.2989–90. The City's Administrative Review Committee ("ARC") reviewed that application and forwarded it to the Planning Commission with a recommendation that it be denied. ECF No. 55-5 at PageID.2981–91.

---

[1] The record uses both "Henkels" and "Henkles." *Compare* ECF No. 55-5 at PageID.2982 *with id.* at PageID.2989. This Court uses "Henkels" throughout the opinion.

GRI purchased the Property in November 2022 for $765,000. ECF No. 55-2 at PageID.2803, 2811. GRI currently leases the Property to W.H. Canon Company ("W.H. Canon"), which intends to operate a landscape-supply business on the Property without expanding the existing buildings. ECF No. 55-6 at PageID.3023, 3027–29, 3093, 3096–97. W.H. Canon has paid GRI more than $10,000 per month in rent since November 2022. ECF Nos. 54-18 at PageID.2216–17; 54-19. GRI states that W.H. Canon has assigned claims concerning the Property to GRI. ECF No. 65 at PageID.6790.

**B. The City's Site-Plan Process**

Section 19.02 of the City's Zoning Ordinance sets out the various levels of Planning Commission review, including which types of development receive each level of review. ECF No. 55-3 at PageID.2879–81.

The ARC performs an initial technical review for compliance with applicable requirements. *Id.* at PageID.2879, 2882. Reusing an existing building without expansion does not require Planning Commission site-plan review if the Development Services Department finds the proposed use similar to or less intensive than the prior use. *Id.* at PageID.2881. But for site plans requiring Planning Commission approval, the Ordinance provides that ARC will forward plans to the Commission "once the plans are in compliance with the zoning ordinance and other applicable ordinances." *Id.* at PageID.2883. The Planning Commission then

considers the application, as well as the reviewing departments' recommendations and may approve the plan, approve it with conditions, postpone a decision, or deny it. *Id.* After Planning Commission approval, the City Engineer conducts a full review of the engineering plans. *Id.* at PageID.2884.

The Parties sharply dispute how rigid this sequence is in practice. The City maintains that ARC cannot forward a site plan to the Planning Commission until the submission complies with applicable ordinance requirements. ECF No. 59 at PageID.4274–75. But the City's Planning Director, Lora Fell, testified that an applicant need not resolve every checklist item before referral, and that ARC may forward a plan to the Planning Commission at the applicant's request—although this usually comes with a recommendation of denial. ECF No. 54-2 at PageID.746–49. GRI cites the Henkels & McCoy application as an example of a plan that proceeded to the Planning Commission despite numerous "not provided" items. *See generally* ECF No. 55-5.

**C. GRI's Four Submissions**

GRI submitted four site plans between August 2022 and August 2023. *See generally* ECF Nos. 55-13; 55-17; 55-27; 55-30. ARC reviewed each and issued a checklist identifying items as provided, not provided, or not applicable. *Id.* Regarding abandonment, Fell initially concluded that the prior use had been abandoned and that the site had to be brought into compliance with current codes

and ordinances, relying on Zoning Ordinance § 24.02(h), which addresses abandonment of nonconforming uses. ECF Nos. 55-17 at PageID.3848; 54-2 at PageID.796–802. However, Fell later agreed that § 24.02(h) does not apply because the proposed landscape-supply use is a conforming use. ECF No. 54-2 at PageID.801–02.

As to the water main, the ARC's checklist included comments about the water main from the very beginning, stating: "water main to be looped."[2] ECF No. 55-13 at PageID.3688 (capitalization omitted). The second checklist repeated the directive. ECF No. 55-17 at PageID.3845. Shortly thereafter, the City's engineering consultant wrote that "[l]ooping of the on-site [water] system will be required." ECF No. 55-18 at PageID.3852. And the City confirmed via e-mail that "[i]t was determined at ARC that the water be looped and it is in our Master Plan also." ECF No. 55-9 at PageID.3354.

GRI's third submission depicted a water main loop labeled "by others." ECF No. 55-25 at PageID.3912; *see also* ECF No. 55-27 at PageID.3938. In an accompanying letter, GRI offered to grant an easement for installation and maintenance of the loop but declined to pay for its construction. ECF No. 55-25 at PageID.3902–03. The third checklist again stated that "water main [was] to be

[2] "Looping" a water main means creating two connections to the water system, allowing water service through one connection if the other fails. ECF No. 55-11 at PageID.3630.

looped, per fire marshal" and called the "by others" notation "incorrect." ECF No. 55-27 at PageID.3935. ARC's fourth checklist again marked the water main issue "not provided." ECF No. 55-30 at PageID.3972. GRI asked Fell to forward the plan to the Planning Commission despite the remaining checklist items, but Fell responded that the City was "waiting for a re-submit." ECF Nos. 55-31 at PageID.3978–79; 55-32 at PageID.3983. Fell did not forward the fourth submission to the Planning Commission at that time. ECF No. 55-32 at PageID.3983.

All told, GRI maintains that the City has prevented both GRI and W.H. Canon from using the Property by withholding Planning Commission review. ECF No. 60 at PageID.6485. However, GRI acknowledged that it had not received what counsel characterized in deposition questions as a "formal notification" on its site plan. ECF No. 54-11 at PageID.1142; *see also* ECF No. 54-12 at PageID.1345, 1381.

The City offers a different account. Fell, City Engineer Christopher Gibbs, and Fire Chief Stephen Portis testified that ARC could not *require* a water main loop, so the issue would be decided later by the Planning Commission or during engineering review. ECF Nos. 54-2 at PageID.812–18, 868–69; 54-13 at PageID.1582–84; 54-14 at PageID.1695–96. In other words, the City maintains the water main issue did not prevent the application from advancing. ECF No. 59 at PageID.4269–73. Rather, the City says the final submission contained too many zoning and safety deficiencies to proceed. ECF No. 54-2 at PageID.861–62. Fell

characterized the checklist's looping notation as a comment identifying a potential later requirement, rather than a requirement ARC had imposed on GRI. ECF No. 54-2 at PageID.818.

GRI, by contrast, points to evidence that several checklist items stemmed from Fell's conceded misapplication of § 24.02(h), that several others would not have prevented referral, and that two items were changed from "provided" to "not provided" even though the relevant drawings had not changed. ECF Nos. 55-7 at PageID.3235–41, 3314–36; 55-30.

The City issued four ordinance citations to GRI in July and September 2023, including a misdemeanor citation alleging use of the Property without site-plan approval. ECF Nos. 55-8 at PageID.3344–51. Three citations were dismissed, and the misdemeanor proceeding was stayed pending the outcome of this litigation. ECF Nos. 55 at PageID.2773 n.1; 60 at PageID.6504.

**D. Fire Flow and the Proposed Loop**

The City's Engineering Standards require a minimum fire flow of 3,000 gallons per minute at 20 psi for commercial and industrial areas. ECF Nos. 55-21 at PageID.3872–73; 55-10 at PageID.3484–85. Tests at three hydrants on the Property produced flows of 2,051, 1,734, and 1,403 gallons per minute at 20 psi. ECF Nos. 55-22 at PageID.3887–89; 55-14 at PageID.3783–84. Former Fire Marshal Stanley Pochron testified that the Property was not adequately protected

under existing conditions, and that drawing sufficient water to fight a fire could drain the system and potentially collapse the water main lines. ECF No. 55-14 at PageID.3782–87. The City points to testimony that GRI proposed storing fertilizer and up to 4,000 gallons of gasoline at the Property, which increased the fire risk on the Property. ECF No. 54-11 at PageID.1080, 1138.

GRI disputes both the governing standard and the proposed loop's effect. It relies on testimony that the Engineering Standards are discretionary best practices that do not govern existing infrastructure or unchanged buildings. ECF No. 54-14 at PageID.1801, 1803–05. It also invokes the City's adopted Fire Code, which, according to GRI, measures aggregate flow from hydrants within a specified distance, not 3,000 gallons per minute from each hydrant. ECF No. 65 at PageID.6781–85.

As to the loop, GRI points to internal engineering communications stating that a westward loop would improve flow at a hydrant in the neighboring residential area, but it would not bring on-site fire flow to 3,000 gallons per minute on the Property. ECF No. 55-23 at PageID.3891. Other loop configurations likewise would not necessarily produce 3,000 gallons per minute at the Property. *Id.*; *see also* ECF No. 55-24 at PageID.3893–3900. Estimates placed the cost of a water main loop between $140,400 and $330,800. ECF No. 55-28 at PageID.3941–43.

### E. This Litigation

GRI filed this action in state court, and the City[3] removed it to this Court. ECF Nos. 1; 1-1. The Complaint contains federal and state unconstitutional-exaction claims (Counts I and II), a class-of-one equal protection claim (Count III), a regulatory-taking claim (Count IV), a substantive-due-process claim (Count V), and four declaratory judgment claims concerning citations issued under the City's zoning and environmental ordinances (Counts VI through IX). ECF No. 1-1 at PageID.12–18.

The City seeks summary judgment on every count. ECF No. 53 at PageID.530–33. GRI seeks summary judgment on Counts I, II, and IV. ECF No. 55 at PageID.2761. All motions are fully briefed, *see* ECF Nos. 59; 60; 64; 65, and this Court has determined that a hearing is not necessary, *see* E.D. Mich. LR 7.1(f)(1).

## II. LEGAL STANDARD

To prevail on summary judgment, a movant must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson*

---

[3] GRI originally brought claims against Fell and former City Attorney Edward Plato, but these were dismissed by stipulation, leaving the City as the only Defendant. ECF No. 61 at PageID.6674.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 252, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52. Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

Cross-motions do not alter that standard. Courts evaluate each motion separately, drawing inferences against the party whose motion is under consideration. *See Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016). Thus, denial of one side's motion does not necessarily require granting the other's. *See id.*

## III. DISCUSSION[4]

### A. Finality and Ripeness (Counts I–V)

---

[4] The City's motion states, without developed argument, that GRI cannot establish municipal liability. ECF No. 53 at PageID.532. Merely identifying an issue without developing the argument is insufficient to place it properly before the court. *See*

In its motion for summary judgment, the City argues that GRI's constitutional land-use claims are unripe because neither the Planning Commission nor the Engineering Department has issued a final decision. ECF Nos. 53 at PageID.551–56; 64 at PageID.6705–08. GRI responds that the City reached a sufficiently definitive position by repeatedly requiring a water main loop and refusing to advance GRI's application without one. ECF No. 60 at PageID.6490–92. This Court finds that a land-use decision must be sufficiently final before it can be challenged in court. But because ARC's repeated looping directive and refusal to advance GRI's application have made the City's position sufficiently definitive to satisfy that requirement, this Court will not grant the City summary judgment on this basis.

In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, the Supreme Court held that a regulatory-takings claim was not ripe until the relevant authority reached a final decision applying the regulations to the property and the owner sought and was denied compensation through available state procedures. 473 U.S. 172, 186, 194–95 (1985). *Knick v. Township of Scott* overruled *Williamson*'s state-compensation requirement but left the separate finality

*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed" forfeited (citation and brackets omitted)). Because the City has not developed its municipal-liability argument, the Court will not construct one on its behalf. Summary judgment on that ground will therefore be denied.

requirement intact. 588 U.S. 180, 185, 197 (2019). The Sixth Circuit recently reaffirmed that land-use challenges ordinarily are not ripe until the relevant local authority adopts a concrete and final position applying the challenged rules to the property. *Grand v. City of Univ. Heights*, 159 F.4th 507, 512–15 (6th Cir. 2025). That requirement extends beyond takings claims to other as-applied constitutional challenges arising from land-use decisions. *Id.*; *see also Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 448 (6th Cir. 2023).

This "finality requirement is relatively modest." *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 478 (2021) (per curiam). The owner needs to show only that the government has reached a definitive position about how the rules apply to the property. *Id.* A formal denial is not necessary—"nothing more than *de facto* finality" is required. *Grand*, 159 F.4th at 513 (quoting *Pakdel*, 594 U.S. at 479). In other words, finality exists when the government's words or actions make clear what requirements it will enforce against the property, rather than leaving their application unresolved for further consideration. *See Pakdel*, 594 U.S. at 478–79. And a municipality may not avoid finality by imposing repetitive or unfair procedures. *Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001).

The City's position was sufficiently final. The challenged action is not the hypothetical denial of a site plan by the Planning Commission. It is ARC's alleged demand that GRI agree to construct public infrastructure—the water main loop—

before ARC would allow the application to reach the Planning Commission. ARC repeated the water main directive in four reviews. ECF Nos. 55-13 at PageID.3688; 55-17 at PageID.3845; 55-27 at PageID.3935; 55-30 at PageID.3972. The City's consultant said looping "will be required." ECF No. 55-18 at PageID.3851–53. And when GRI expressly requested referral to the Planning Commission, ECF Nos. 55-31 at PageID.3978–79, Fell said the City was waiting for another submission, ECF No. 55-32 at PageID.3983. On that record, it is reasonable for GRI to believe that the practical consequence of refusing the alleged condition meant that ARC would not advance the application to the Planning Commission. *See Pakdel*, 594 U.S. at 478–80; *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013).

The City relies on *Grand* to argue that GRI needed a final decision from the Planning Commission or Engineering Department. ECF No. 64 at PageID.6707–09. But in *Grand*, the applicant withdrew his request while the reviewing bodies were still considering whether the ordinance applied to his property. 159 F.4th at 513–15. Here, ARC completed four reviews, repeatedly identified the same water main issue, and declined GRI's request to forward GRI's application to the Planning Commission. ECF Nos. 55-13 at PageID.3688; 55-17 at PageID.3845; 55-27 at PageID.3935; 55-30 at PageID.3972; 55-31 at PageID.3978–79; 55-32 at PageID.3983. This case therefore does not present the uncertainty about the government's position that defeated finality in *Grand*.

The City points out that GRI's site plan was placed on a May 2025 Planning Commission agenda, but GRI asked to remove it. ECF Nos. 64 at PageID.6708–09; 64-2 at PageID.6772. GRI's corporate representative, Kirk Kahner, testified that the City agreed during a settlement conference in this litigation to place the plan on the agenda as a possible path toward resolving the dispute. ECF No. 54-18 at PageID.2193. He attributed the later withdrawal to the Water Department's alleged refusal to issue a repair permit until the main was looped and the litigation resolved, as well as a revised checklist that GRI disputed. ECF No. 54-18 at PageID.2191–97. This does not change the analysis. The City communicated a definitive position before suit, so GRI's withdrawal from a Planning Commission agenda during litigation does not render that earlier dispute unripe. *See Pakdel*, 594 U.S. at 479; *cf. Grand*, 159 F.4th at 513–15. Requiring GRI to obtain a decision from a body that ARC would not allow it to reach would turn a modest finality rule into an exhaustion trap. *Pakdel* forecloses that approach. *See* 594 U.S. at 478–79.

Finally, the City notes that GRI did not appeal to the Zoning Board of Appeals. ECF No. 64 at PageID.6705. But exhaustion and finality are distinct. *Pakdel*, 594 U.S. at 478. An available local procedure like exhaustion bears on finality only when "avenues still remain for the government to clarify or change its decision," and once the relevant land-use authority has reached a definitive decision, the owner need not pursue further local remedies in order for the decision to be final. *SW Nashville EB*

*Owner, LLC v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 25-5781, 2026 WL 2364309, at *8 (6th Cir. Aug. 14, 2026) (quoting *Pakdel*, 594 U.S. at 480). The City's prelitigation communications leave no uncertainty about ARC's position or the consequence of GRI's refusal, so the decision is final.

Accordingly, the City has not shown that GRI's claims are unripe for lack of a sufficiently final land-use decision, and summary judgment on that basis will be denied.

**B. Federal and State Exaction Claims (Counts I and II)**

Both Parties seek summary judgment on GRI's federal and state exaction claims. GRI argues that the City conditioned further site-plan review on GRI constructing and dedicating a costly public water main loop that was neither sufficiently related nor proportional, to the effects of its proposed use. ECF No. 55 at PageID.2782–89. The City argues that it is entitled to summary judgment because ARC's comments were preliminary; no authorized decisionmaker imposed a final exaction; unresolved site-plan deficiencies—not GRI's refusal to construct the loop—prevented the application from advancing; and any looping requirement would address legitimate fire-flow concerns attributable to GRI's proposed operations. ECF Nos. 53 at PageID.554–56; 59 at PageID.4283–89. This Court finds that there are material factual disputes that preclude summary judgment for either Party on Counts I and II.

The Takings Clause prohibits the government from taking private property for public use without just compensation.[5] U.S. CONST. amend. V. Under the unconstitutional-conditions doctrine, a government may not use its land-use permitting power to obtain property it could not take directly without paying compensation. *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834–37 (1987). The doctrine applies when the government denies a permit because the owner refuses a condition, *Koontz*, 570 U.S. at 606, and when the government demands money tied to a specific parcel, *id.* at 612–15. The doctrine also applies to legislatively imposed conditions. *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 280 (2024).

Whether a permit condition is an unconstitutional taking is a three-step analysis. First, the court asks whether the condition would be a taking if imposed directly. *Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 825 (6th Cir. 2023). "If so, the government must show a 'nexus' between the condition and the proposed project's social costs." *Id.* Finally, the government must show "rough proportionality" between the condition's burden on the owner and the project's burden on society. *Id.* (quoting *Dolan*, 512 U.S. at 391). Rough

[5] The Parties analyze GRI's parallel claim under the Michigan Constitution (Count II) under the same framework. This Court does the same for present purposes. *See AFT Mich. v. State*, 866 N.W.2d 782, 799–800 (Mich. 2015); *see also Charter Twp. of Canton v. 44650, Inc.*, 12 N.W.3d 56, 73 n.9 (Mich. Ct. App. 2023).

proportionality requires an individualized determination of the "nature and extent of the impact of the proposed development." *Dolan*, 512 U.S. at 391.

*1. Imposition of a Condition*

If the City required GRI to install a public water main and convey an easement as the price of site-plan review or approval, the first *Knight* step would be satisfied. *See Knight*, 67 F.4th at 825; *Nollan*, 483 U.S. at 831–32 (recognizing that a compelled public-access easement would constitute a taking if imposed directly); *Koontz*, 570 U.S. at 612–15 (applying exactions scrutiny to demands to fund improvements tied to a specific parcel). A compelled easement is the paradigmatic property interest addressed by *Nollan* and *Dolan*, and a demand to fund parcel-specific public infrastructure may qualify as a monetary exaction under *Koontz*. The threshold dispute, therefore, is whether the City made such a demand.

Neither side is entitled to summary judgment on whether the City imposed an exaction. GRI contends that ARC required it to pay to construct a public water main loop and grant the City an easement, and withheld referral to the Planning Commission when GRI refused to pay. ECF No. 55 at PageID.2769–70. A reasonable factfinder could accept that account. Four ARC checklists stated that the main was "to be looped" or "be looped, per fire marshal." ECF Nos. 55-13 at PageID.3688; 55-17 at PageID.3845; 55-27 at PageID.3935; 55-30 at PageID.3972. The City's engineering consultant stated that looping "will be required." ECF No.

55-18 at PageID.3852–53. GRI then offered an easement but refused to pay for construction, and ARC marked its notation assigning construction to "others" as "incorrect." ECF Nos. 55-25 at PageID.3902–03; 55-27 at PageID.3935. When GRI requested referral to the Planning Commission, ECF No. 55-31 at PageID.3978–79, Fell responded that the City was awaiting another submission, ECF No. 55-32 at PageID.3983. A factfinder could infer from that sequence that ARC expected GRI to fund the water main loop before forwarding the application.

But a reasonable factfinder could also credit the City's account of what ARC's comments meant. Fell and Gibbs testified that the engineering comments were preliminary, that ARC lacked authority to require GRI to construct a loop, and that later review would determine whether and how the main would be looped. ECF Nos. 54-2 at PageID.812–18, 868–69; 54-13 at PageID.1582–84. The final checklist likewise described engineering review as "preliminary" and discussed possible cost sharing and alternative alignments. ECF No. 55-30 at PageID.3971, 3975. Put differently, this Court's finality ruling establishes that ARC had made its position on advancing the application as submitted clear. But this ruling does not decide whether ARC had conditioned advancement on GRI's financing the loop. Resolving that factual dispute would require weighing the Parties' evidence and drawing inferences against one of them, which this Court may not do on cross motions for summary judgment. *Anderson*, 477 U.S. at 255.

The same is true of causation. The City says ARC refused to forward the plan because of the numerous checklist deficiencies, not the water main looping. ECF Nos. 54-2 at PageID.818, 861–62; 59 at PageID.4271, 4273. However, GRI points to evidence that the outstanding items did not necessarily prevent referral, including Fell's testimony that ARC could forward a plan with unresolved checklist items and recommend denial. ECF No. 54-2 at PageID.746–49. She acknowledged, for example, that a missing tree permit or dumpster details would not prevent referral. ECF No. 55-7 at PageID.3335–36. Fell also agreed that § 24.02(h)'s abandonment provision did not apply to GRI's proposed conforming use. ECF No. 54-2 at PageID.799–802. GRI further points to changes in how the third and fourth checklists marked certain items, including buffer-wall details. ECF Nos. 55-27 at PageID.3936; 55-30 at PageID.3973. Finally, Henkels & McCoy's application for the same Property reached the Planning Commission despite outstanding checklist items, and Fell forwarded that application with a recommendation of denial. ECF No. 55-5 at PageID.2982–91.

On this record, a jury could find either that legitimate incompleteness stopped the application or that the checklist was used as a bottleneck after GRI resisted the alleged exaction. Therefore, neither Party is entitled to summary judgment.

*2. Nexus and Rough Proportionality*

Disputed facts also preclude summary judgment on nexus and rough

proportionality. The City has identified a legitimate safety concern: fire protection at an industrial property bordering residences. ECF No. 59 at PageID.4287–88. The City offers the Engineering Standards, the hydrant tests, Pochron's testimony about the risk of drawing down the water system, and Portis's admissible testimony about general operational fire-safety concerns. *Id.* If credited, that evidence could establish the necessary "connection to the project's harmful social effects" by linking improved water service to the fire risk associated with GRI's proposed operations. *See Knight*, 67 F.4th at 825.

GRI, however, offers evidence from which a reasonable factfinder could conclude that the proposed loop was directed at a preexisting public-infrastructure deficiency, rather than an impact attributable to GRI's project. This evidence includes GRI proposing to use the Property in the same general way it had been used before, without enlarging the buildings. ECF Nos. 55-4 at PageID.2980; 55-6 at PageID.3027–29, 3093, 3096–97. And internal engineering correspondence indicates that the westward loop would not bring the Property's hydrants to the City's asserted 3,000-gallon-per-minute standard, but *would* improve a hydrant in an adjacent subdivision. ECF No. 55-23 at PageID.3891. GRI also disputes whether that standard applies at all, and whether fire flow should be measured in the aggregate. ECF Nos. 54-14 at PageID.1801, 1803–05; 65 at PageID.6780–85. Those disputes bear directly on why the City sought the loop, whether the condition bears

an "essential nexus" to the proposed development's effects, and whether the nature and extent of the condition are roughly proportional to those effects. *See Dolan*, 512 U.S. at 386, 391; *see also Knight*, 67 F.4th at 825.

The estimated construction costs are between $140,400 and $330,800, in addition to any easement. ECF No. 55-28 at PageID.3941–43. Those estimates show the potential burden on GRI. Rough proportionality asks whether the nature and extent of the improvement demanded of GRI correspond to the additional fire protection need created by its proposed use. *See Dolan*, 512 U.S. at 391; *see also Knight*, 67 F.4th at 825–26. Applying that standard requires identifying what improvement the City allegedly demanded and how much of its cost GRI would bear.

The engineering comments discuss different loop alignments and possible cost sharing, leaving those aspects of the alleged burden disputed. ECF Nos. 55-27 at PageID.3938; 55-30 at PageID.3975. The City ties the need for improved fire flow to GRI's proposed operations, including gasoline and fertilizer storage. ECF No. 59 at PageID.4287–88. But GRI points to an internal engineering e-mail stating that a westward loop would improve flow at a hydrant in the neighboring Syracuse area without bringing the Property's hydrants up to the City's asserted 3,000-gallon-per-minute standard. ECF No. 55-23 at PageID.3891. Those disputes prevent this Court from deciding whether the alleged burden on GRI is roughly proportional to its

project's impact. Accordingly, both Parties' motions will be denied as to Counts I and II.

**C. Regulatory Taking (Count IV)**

Count IV alleges that the City's refusal to allow use of the Property while withholding Planning Commission review effected a temporary regulatory taking. ECF No. 1-1 at PageID.15–16. GRI argues that the City temporarily deprived GRI of all economically beneficial use of the Property, invoking the categorical takings rule of *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). ECF No. 55 at PageID.2789–90. GRI also argues that the City's actions constitute a taking under the multifactor test of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). ECF No. 55 at PageID.2790–93. The City responds that GRI's continuing rental income forecloses a total-taking claim, and that GRI lacks evidence of a substantial loss in value to support a taking claim under *Penn Central*. ECF No. 53 at PageID.559–61. This Court finds that GRI's temporary-taking claim requires analysis under *Penn Central* and that the record does not permit a reasonable factfinder to find a compensable taking under that framework.

A regulation that deprives an owner of all economically beneficial use of the property may qualify as a categorical taking under *Lucas*, 505 U.S. at 1019. A temporary restriction does not become a categorical taking merely because the taking prevents all use for part of the ownership period. *Tahoe-Sierra Pres. Council,*

*Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 327–32 (2002). Rather, the property is considered as a whole, including the restriction's duration. *Id.* By contrast, a regulatory-takings claim outside that categorical rule requires an "essentially ad hoc, factual" inquiry into the regulation's economic impact, its interference with distinct investment-backed expectations, and the character of the governmental action. *Penn Cent.*, 438 U.S. at 124. Because Count IV challenges a temporary restriction on GRI's use of the Property, this Court evaluates the count under *Penn Central*, even if GRI could show that no use was possible during the alleged restriction. *Tahoe-Sierra*, 535 U.S. at 331–32.

This Court finds that GRI's *Penn Central* theory lacks proof. Under *Penn Central*, this Court considers the alleged restriction's economic effect on GRI, its effect on GRI's reasonable investment-backed expectations, and the nature of the City's action. 438 U.S. at 124. The inquiry is fact intensive, but a plaintiff opposing summary judgment must still produce evidence from which a factfinder can apply it. *See Celotex*, 477 U.S. at 322–23; *see also Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 456–57 (6th Cir. 2009) (rejecting a *Penn Central* theory supported only by generalized assertions rather than specific evidence concerning the property and its likely diminution in value).

GRI's briefing identifies no appraisal, before-and-after valuation, supported market-rent comparison, or other non-speculative measure of the Property's alleged

loss in value. *See* ECF Nos. 55 at PageID.2790–92; 60 at PageID.6492–94. Rather, GRI points to the rent payments it received from W.H. Canon, where Kahner testified that W.H. Canon had paid approximately $10,250 per month since November 2022 and that the rent exceeded GRI's mortgage obligation. ECF Nos. 54-18 at PageID.2216–17; 54-19 at PageID.2310, 2320. Kahner described W.H. Canon's rent as "submarket" and estimated that rent "probably" would have risen to $15,000 or $20,000 per month had Canon begun operating there. ECF No. 54-18 at PageID.2206. But the lease provided for no such increase, and Kahner acknowledged that GRI could not impose one unilaterally. *Id.* at PageID.2206–07. The continuing rent does not, by itself, defeat a *Penn Central* claim, but Kahner's unsupported estimate of a possible increase does not provide a non-speculative measure of any decline in the value of GRI's interest in the Property.

Kahner also identified rent at another location, utility bills, and engineering charges that W.H. Canon incurred as expenses borne out of the alleged taking. *Id.* at PageID.2218–22. However, even assuming GRI may pursue W.H. Canon's claims under the later assignment, neither those expenses nor the assignment establishes a decline in the value of GRI's ownership interest. *See* ECF No. 54-19 at PageID.2334–35. This Court, therefore, finds that GRI has not established this requisite element. *See Penn Cent.*, 438 U.S. at 124.

As to the third element, GRI's investment-backed expectations provide limited support for Count IV. The Property's industrial zoning and history of landscape-supply use gave GRI reason to expect that such a business could operate there. ECF Nos. 55-3 at PageID.2825–26; 55-4 at PageID.2980. But GRI submitted its first site plan before purchasing the Property and acquired title after ARC issued a checklist stating that the "water main [was] to be looped." ECF Nos. 55-2 at PageID.2803 (capitalization omitted); 55-13 at PageID.3688. That notice does not bar a takings claim, *see Palazzolo v. Rhode Island*, 533 U.S. 606, 626–30 (2001), but it limits GRI's asserted expectation of immediate occupancy without resolving the City's site-plan objections.

Therefore, because no reasonable factfinder could assess a substantial economic impact on GRI's Property interest without speculation, the City is entitled to summary judgment on Count IV.[6]

---

[6] The character of the City's action presents a different question. If a factfinder credited GRI's evidence that the City singled it out and used the review process to demand a public improvement, this factor could favor GRI. But even drawing that inference in GRI's favor, this factor does not cure the absence of evidence establishing a meaningful economic impact on GRI's property interest. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005) (describing economic impact and interference with investment-backed expectations as the "primary" *Penn Central* factors); *see also CCA Assocs. v. United States*, 667 F.3d 1239, 1248 (Fed. Cir. 2011) (holding that although the character of the governmental action supported finding a taking, that factor was not dispositive where the economic-injury and expectations factors weighed against the claimant).

**D. Class-of-One Equal Protection (Count III)**

GRI argues that the City treated GRI differently from Henkels & McCoy by refusing to forward GRI's site plan to the Planning Commission while forwarding Henkels & McCoy's application despite comparable deficiencies. ECF No. 60 at PageID.6495–99. The City responds that GRI has not established that Henkels & McCoy is a valid comparator or that the difference in treatment lacked a rational basis. ECF No. 64 at PageID.6708–09. The Parties' evidence leaves genuine disputes about whether the applications are comparable and why the City treated them differently, so this Court will deny summary judgment on Count III.

A class-of-one plaintiff must show that the government "intentionally treated [the plaintiff] differently from others similarly situated and there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Lathfield Invs., LLC v. City of Lathrup Vill.*, 136 F.4th 282, 302 (6th Cir. 2025). The plaintiff's burden is heavy: the challenged action must be so unrelated to any legitimate purpose that it can be called irrational. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011).

GRI has presented enough evidence to show a genuine dispute of fact. It identifies Henkels & McCoy, a prior applicant involving the same Property, the same initial review process, and the same Planning Director. *See generally* ECF Nos. 55-

5; 55-13.[7] The Henkels & McCoy checklist contained numerous "not provided" items, yet Fell testified that Henkels & McCoy's application reached the Planning Commission despite unmet ordinance requirements and that the Commission denied it. ECF Nos. 55-7 at PageID.3221–22. Her contemporaneous letter recommended that the Commission consider denial. ECF No. 55-5 at PageID.2989–91. GRI's final checklist contained many of the same or analogous omissions, but its request for referral was refused. *See generally* ECF No. 55-30. The difference in proposed uses may ultimately defeat the comparison, but a jury could find the applications alike in the respects relevant to the challenged gatekeeping decision—especially because Henkels & McCoy sought a special land use while GRI claims a continuation of a by-right use.

Moreover, this Court notes that other evidence supports an inference of intentional and irrational differential treatment. For example, items 31 and 68 were marked "provided" on earlier GRI checklists and later marked "not provided" even

[7] The City objects that GRI obtained the Henkels & McCoy materials from another federal docket and did not authenticate them. ECF No. 64 at PageID.6708–09. But Civil Rule 56(c)(2) asks whether the material *can be presented* in admissible form, not whether the copy submitted at summary judgment is already in trial-ready form. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 423 (6th Cir. 2021); *see also Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017). And nothing suggests that the Henkels & McCoy materials could not be authenticated at trial through a City witness familiar with the records, or other evidence that the documents are what GRI claims them to be. *See, e.g.*, FED. R. EVID. 901(a), (b)(1), (4); *see also Mangum*, 674 F. App'x at 537.

though, according to GRI, the relevant information did not change. ECF Nos. 55-17 at PageID.3844, 3846; 55-27 at PageID.3933, 3936; 55-30 at PageID.3970, 3973. The City has not explained why the status changed when the submissions did not change. Fell testified that several deficiencies would not themselves prevent referral. ECF No. 55-7 at PageID.3321–36. And the final refusal followed GRI's objection to paying for the loop. *See* ECF Nos. 55-29 at PageID.3945–46. Viewed together and in GRI's favor, that evidence would allow a reasonable jury to reject the City's completeness rationale as pretextual. *See Loesel v. City of Frankenmuth*, 692 F.3d 452, 465–66 (6th Cir. 2012) (concluding, in a class-of-one equal-protection case, that conflicting testimony and planning documents created a jury question concerning the City's asserted rational basis).

To be clear, this Court does not hold that Henkels is similarly situated as a matter of law or that GRI has proved irrational treatment. The City may persuade a jury that different uses, site conditions, standards, or deficiencies justified different processing. But those record-based explanations are to be tested against GRI's contrary evidence, not grounds for judgment at this juncture. Therefore, the City's motion will be denied as to Count III.

**E. Substantive Due Process (Count V)**

In Count V, GRI alleges that the City violated GRI's substantive-due-process rights by arbitrarily interfering with GRI's asserted vested right to use the Property

for a by-right landscape-supply business. *See* ECF No. 60 at PageID.6500–03. The City seeks summary judgment, arguing that GRI has no protected property interest because GRI never obtained the approvals necessary to establish a vested entitlement and that, in any event, the City's actions were rationally related to legitimate land-use and public-safety interests. *See* ECF No. 53 at PageID.562–63. Because genuine disputes remain both as to the scope of GRI's protected property interest and whether the City's conduct was arbitrary, summary judgment will be denied as to Count V.

A landowner alleging a substantive-due-process violation must show a constitutionally protected property interest and arbitrary or capricious deprivation of that interest. *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012). State law helps define the underlying interest. *Id.* at 855–56. Michigan recognizes an owner's vested interest in the use and possession of real estate. *Bonner v. City of Brighton*, 848 N.W.2d 380, 389 (Mich. 2014). But ownership does not, by itself, entitle an applicant to a discretionary land-use approval. *EJS Props.*, 698 F.3d at 856.

GRI's theory is not merely that it hoped to receive a discretionary approval. It asserts that the Zoning Ordinance permits landscape supply use by right, that its proposed use is the same as the Property's historical conforming use, and that its proposal qualified for Table 19.02's exemption from Planning Commission site-plan review. ECF Nos. 55-3 at PageID.2825–30, 2879; *see also* ECF No. 60 at

PageID.6484–85. The City disputes whether the proposal qualified for that exemption. ECF No. 59 at PageID.4275–76; *see also* ECF No. 64 at PageID.6703–04.

The relevant question, however, is more fundamental: whether the City had discretion to prohibit GRI's proposed continuation of a conforming use, which it has done by failing to advance GRI's application. Fell agreed that GRI's proposed use was not a nonconforming use and that the nonconforming-use provision "should not have been appl[ied] to their site application." ECF No. 55-7 at PageID.3240–41. That concession supports GRI's challenge to the abandonment rationale, particularly given its evidence that it proposed no building expansion. ECF No. 55-6 at PageID.3027–29. But it does not establish that the City had to approve GRI's proposal because Table 19.02 conditions the re-use procedure on a Development Services Department determination that the use is similar or less intensive in its external effects. ECF No. 55-3 at PageID.2881. Therefore, GRI has claimed a protected interest, not merely in ownership of the Property or in receiving a discretionary approval, but in continuing a use allegedly permitted by the Property's existing zoning classification without further discretionary approval. *See Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 897 (6th Cir. 1991) (recognizing a protected property interest where the existing zoning classification permitted the proposed development as of right and the owner had

substantially relied on that classification); *cf. Rubicon Real Est. Holdings, LLC v. City of Pontiac*, 179 F.4th 431, 445 (6th Cir. 2026) (distinguishing a protected entitlement from an interest that remains contingent on further discretionary governmental approvals). If GRI is correct about the ordinance's application, the City would not have possessed the kind of unfettered discretion that defeats a protected-property-interest claim. On this record, this Court cannot conclude as a matter of law that GRI lacked a protected interest.

Nor can this Court resolve arbitrariness as a matter of law. Fire safety and the orderly regulation of land use are legitimate governmental interests. *See Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 391 (1926) (recognizing fire prevention as a valid basis for land-use regulation); *see also Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1223–24 (6th Cir. 1992) (recognizing legitimate state land-use concerns). A simple mistake in interpreting an ordinance is not an actionable federal due-process violation. *See Golf Vill. N., LLC v. City of Powell*, 42 F.4th 593, 601 (6th Cir. 2022) (explaining that arbitrariness in the zoning context must be "so extreme that it shocks the conscience" and observing that very few zoning cases satisfy that standard (citation omitted)). But GRI has produced evidence, including what appears to be a repeated use of an inapplicable abandonment provision, shifting checklist determinations, the refusal to follow the asserted practice of referral with a recommendation of denial, and an alleged demand for a costly public improvement

that internal engineering communications suggested would principally benefit neighboring infrastructure. *See* ECF Nos. 54-2 at PageID.746–49, 796–802, 882–83; 55-23 at PageID.3891; *see generally* ECF Nos. 55-5; 55-17; 55-27; 55-30. If a factfinder credits that account, the factfinder could find an arbitrary deprivation rather than a good-faith application of land-use rules. Therefore, neither Party will be entitled to summary judgment here.

### F. Requests for Declaratory Relief (Counts VI–IX)[8]

In Counts VI–IX, GRI seeks declarations concerning the City's application of its zoning and environmental ordinances to GRI's use of the Property. ECF No. 1-1 at PageID.17–18. The City argues that those claims are moot because it dismissed three ordinance citations and stayed the fourth. ECF No. 53 at PageID.564. GRI responds that the Parties continue to dispute whether GRI may use and maintain the Property without violating those ordinances and that further enforcement remains possible. ECF No. 60 at PageID.6504–06. This Court finds that the dismissed and stayed citations do not moot the declaratory-judgment claims.

---

[8] Although GRI pleads Counts VI–IX as separate counts, declaratory judgment is a remedy rather than an independent cause of action. *See Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). The Court therefore construes those counts as requests for declarations concerning GRI's rights and obligations under the identified zoning and environmental ordinances. ECF No. 1-1 at PageID.17–19. This distinction does not itself foreclose declaratory relief, which remains available in an actual controversy within the Court's jurisdiction. 28 U.S.C. § 2201(a). The Court accordingly considers whether the City's dismissal or stay of the ordinance citations has mooted the underlying disputes.

A stayed enforcement proceeding remains a live controversy, and the City does not explain how a pause pending this litigation extinguishes the parties' adverse interests. *See Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.,* 466 U.S. 435, 442 (1984) ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."). Nor do the dismissed citations eliminate the underlying dispute. The declaratory counts concern the meaning and application of the zoning and environmental provisions that generated the citations. ECF No. 1-1 at PageID.17–18. The City maintains that GRI may not use the Property without site-plan approval,[9] and one citation remains pending. ECF Nos. 54-18 at PageID.2222–24; 60 at PageID.6504–06. A plaintiff need not await another enforcement action where the challenged provisions remain applicable and there is a credible threat of enforcement. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–64 (2014) (holding that actual prosecution is unnecessary where the plaintiff faces a credible threat of enforcement and treating past enforcement as evidence that the threat is not speculative). Thus, the threatened application of the disputed provisions is not hypothetical.

---

[9] Even while insisting that the declaratory claims present no live controversy, the City's position defends the same interpretation of the ordinances that gave rise to the citations in the first place. *See* ECF Nos. 59 at PageID.4292–93; 64 at PageID.6701–02.

Moreover, a defendant's voluntary cessation moots a claim only when it is absolutely clear the challenged conduct cannot reasonably recur. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The City has offered no evidence that it will not issue new citations if GRI resumes the disputed activity. The City has therefore not carried its burden to establish mootness, and its motion will be denied as to Counts VI through IX.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 53, is **GRANTED IN PART AND DENIED IN PART**. The Motion is granted as to Count IV and denied as to Counts I, II, III, V, VI, VII, VIII, and IX.

Further, it is **ORDERED** that Plaintiff's Motion for Partial Summary Judgment, ECF No. 55, is **DENIED**.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: September 30, 2026